# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 3, 2014 Session

## TIMOTHY A. BAXTER v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. C-13-193    Roy B. Morgan, Jr., Judge**

———————————

**No. W2013-02427-CCA-R3-PC  - Filed November 26, 2014**

———————————

A Madison County jury found the Petitioner, Timothy A. Baxter, guilty of aggravated assault, and the trial court sentenced him to a twelve-year sentence in the Tennessee Department of Correction.  The Petitioner appealed, and this Court affirmed the conviction in *State v. Timothy A. Baxter*, No. W2012-00361-CCA-R3-CD, 2013 WL 1197867 (Tenn. Crim. App., at Jackson, March 25, 2013), *perm. app. denied* (Tenn. June 13, 2013).  The Petitioner filed a petition for post-conviction relief, pro se, which he later amended with the assistance of counsel.  The Petitioner subsequently filed a motion requesting that the post-conviction judge recuse himself.  The post-conviction court held an evidentiary hearing on the motion to recuse and the petition for post-conviction relief, after which it denied both.  On appeal, the Petitioner contends that the post-conviction court erred when it denied his post-conviction petition because he received the ineffective assistance of counsel at trial, and he further contends that the post-conviction court erred when it denied his motion to recuse because there was a reasonable basis for questioning the post-conviction judge's impartiality.  After a thorough review of the record and applicable law, we affirm the post-conviction court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ROGER A. PAGE and ROBERT L. HOLLOWAY, JR., JJ., joined.

Joshua B. Dougan, Jackson, Tennessee, for the appellant, Timothy A. Baxter.

Herbert E. Slatery, III, Attorney General and Reporter; J. Ross Dyer, Senior Counsel; James G. Woodall, District Attorney General, Alfred L. Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Facts
## A. Trial

This case arises from the Petitioner's assault of the victim, Richard Upright, by pushing him to the ground in an Exxon station parking lot. Based on this conduct, a Madison County grand jury indicted the Petitioner for aggravated assault. On direct appeal, this Court summarized the underlying facts of the case as follows:

> The victim, Richard Upright, testified that he was seventy-three years old at the time of trial. He recalled driving south on Highway 45 leaving Jackson, Tennessee, on December 8, 2010, when a car drove past him "like a maniac in the suicide lane," referring to the center lane of an undivided highway. The victim continued driving and soon thereafter noticed that the speeding car was behind him again. The victim observed that the driver of the car, who he later learned was [the Petitioner], was again attempting to pass him. The victim was traveling in the left lane. At this point on the road, there was a grass median. He stated that it appeared to him that [the Petitioner] was attempting to pass traffic by driving on the grass. The victim testified:
>
>> He pulled over and he was gonna [sic] pass me down the median in the grass, is what it looked like in the mirror. And I had other cars ahead of me and behind me, and when he saw he couldn't make it, he pulled back on the road, and then he pulled over on the shoulder, blacktop shoulder. When he pulled over there, he passed everything on the wrong side of traffic on the shoulder. He passed by two or three cars, and I mean crazy like. Then he come [sic]-worked his way in front of me and he slammed the brakes on so they'd run into him, and about that time I got worried.
>
>> . . . .
>
> The victim's passenger, Mary Thomas, used her cellular telephone to call 9-1-1. The victim noted that [the Petitioner] turned off the highway and onto a "side road" toward Henderson, so he pulled over at an Exxon gas station in Pinson to allow Ms. Thomas to complete the call. When the victim pulled into the parking lot, a pick-up truck with two men inside pulled up beside him. One of the men had witnessed the episode involving [the

2

Petitioner] and asked the victim if he was okay. As the victim was speaking with the man, [the Petitioner] pulled in behind them. [The Petitioner] stated, "I don't care if you are an old man. I'll hit you anyway." The victim responded, "Well[,] I didn't do nothing [sic]." The victim observed that [the Petitioner] "looked like he was on something, alcohol or drugs." The victim walked around [the Petitioner's] car to record the vehicle's license number. When he reached the rear of the car, [the Petitioner] "shoved" him to the ground. The victim heard "crunching" sounds when he fell. [The Petitioner] entered his vehicle and fled the scene.

The victim testified that when he fell, he could not get up and was "doubled up." He described the pain as "killing pain." He testified, "I don't care if it's 1 to 100 or 1 to 10; it's maximum. The pain was maximum in my shoulder and . . . my hip." When asked if his pain was extreme, he further stated that the pain was "more than [he could] handle."

A police officer arrived and asked the victim if he wanted to be transported to the hospital in an ambulance. The victim declined and drove himself to his doctor's office. His treating physician was not in the office, so the victim returned the following day to consult with his personal physician. His doctor ordered x-rays and referred him to another physician, who referred him to the hospital.

When the victim arrived at the hospital, a doctor administered a nerve block. The victim stated that he spent four or five days in the hospital. At the time of trial, more than ten months after the incident, the victim was still under medical care for the pain in his neck and shoulder resulting from his being knocked to the ground. He testified that the pain was still "unbearable." He initially missed two months of work as a truck driver because the pain was so severe. He returned to work, notwithstanding the pain, but had to quit his job because the pain worsened over time. The victim testified that the pain was primarily located in his shoulders, back, neck, and hips.

On cross-examination, the victim acknowledged that he eventually stood up on his own after [the Petitioner] knocked him down. He was able to speak with some people who had gathered at the gas station. When the victim left the gas station, he immediately drove to his doctor's office, which was a walk-in clinic. The victim admitted that prior to this occasion, he was taking blood pressure medication.

Sergeant Terry Stewart with the Madison County Sheriff's Department testified that he was assigned to investigate the victim's case. During the course of the investigation, he developed [the Petitioner] as a suspect and determined that the car he had been driving was registered to [the Petitioner's] girlfriend, Jennifer Rowan. Sergeant Stewart reviewed a statement given by [the Petitioner] wherein he recounted the event but omitted any reference to his knocking the victim to the ground.

James Bunny testified that he was driving on Highway 45 South and witnessed [the Petitioner's] vehicle attempting to "ram" the back of the victim's vehicle. He called 9-1-1. Mr. Bunny observed [the Petitioner's] vehicle pull in front of the victim's car, and [the Petitioner] "slammed on his brakes a couple of times[,] trying to stop [the victim], apparently. . . ." He saw the victim pull into the parking lot of the gas station. Mr. Bunny turned around, stopped on the opposite side of the road, and saw [the Petitioner] pull into the parking lot, as well. He observed that [the Petitioner] looked "very irate" and was pointing his finger at the victim. Mr. Bunny witnessed [the Petitioner] either push or hit the victim and knock him to the ground. [The Petitioner] then left the scene in his vehicle.

Jean Bunny testified that she, too, witnessed the victim's car pass their vehicle, followed by [the Petitioner's] car, which seemed to be trying to "bump" the victim's car. She saw [the Petitioner's] car pass the victim's car, and [the Petitioner] applied his brakes to force the victim to collide with him. Ms. Bunny testified that after the two cars pulled into the gas station parking lot, they turned their vehicle around and returned to the scene because they "knew it looked like road rage." She observed [the Petitioner] "shaking his finger" at the victim, and the victim "started to put his hand up" to push [the Petitioner's] finger away. [The Petitioner] then pushed the victim to the ground and drove away. Ms. Bunny testified that she and her husband drove to the gas station to check on the victim. She recounted that the victim was shaken up and that he stated that his shoulder hurt "quite severely."

*Baxter*, 2013 WL 1197867, at *1-3.

## B. Post-Conviction Hearing

4

On July 15, 2013, the Petitioner filed pro se a petition for post-conviction relief alleging multiple grounds for relief, particularly that he had received the ineffective assistance of counsel when his trial attorney, ("Counsel") failed to introduce the victim's medical records.[1]  On August 30, 2013, with the assistance of an appointed attorney, the Petitioner filed an amended petition, wherein he contended that he had received the ineffective assistance of counsel because Counsel had filed a motion to exclude the victim's medical records, when, the Petitioner contended, Counsel should have used the records to impeach the victim regarding the victim's testimony about the level of pain he suffered after being pushed by the Petitioner.  The Petitioner further argued that Counsel's failure to impeach the victim's testimony with the medical records prejudiced the Petitioner because, as no other evidence of the victim's pain level was introduced, impeachment of the victim's testimony presented a reasonable probability that the jury would have found the victim not credible.

On October 1, 2013, the Petitioner filed a motion requesting that the post-conviction judge recuse himself from the case because the judge had presided over the case during the trial and because the Petitioner had filed complaints against the judge in the past.  Based on "this prior litigation," the Petitioner alleged that a question was raised about whether the judge could be impartial or "act with absolute objectivity. . . ."

On October 3, 2013, the post-conviction court held a hearing on the motion to recuse and the petition for post-conviction relief.  Concerning the motion to recuse, the post-conviction court made the following statement:

> Okay.  The history of the case, I won't go over the history other than it started out in this court in this particular case as a[n] aggravated assault and went to jury trial.  The [Petitioner] was found guilty by a jury of his peers.  I emphasize it was not a bench trial, it was a jury trial.  The case was carried up on appeal with the assistance of counsel, and the Court of Criminal Appeals affirmed the case in all ways and I think the petition was denied as far as [the] Tennessee Supreme Court.  But again, we're here today – although there's been a lot of things in between, we're here on the pro se petition at the time it was initially filed regarding post-conviction, and it is a timely filed petition.
>
> When I reviewed the Motion to Recuse, [], there are three factual bases set forth and that's, the Petitioner in this case has filed a complaint against me as Judge back in June of 2005 alleging I had deprived him of constitutional

---

[1]The Petitioner's remaining arguments in his original post-conviction petition are not the subject of this appeal.

5

rights, including a right to an evidentiary hearing, and then the second allegation factually is that there was a second complaint filed against [me] the Judge, . . ., February of 2012 alleging illegal detention, violation of due process, improperly allowing a lay witness to testify as an expert, and then, [third], there was a civil suit filed in the U.S. District Court September 2012.
. . . .

The post-conviction court noted that those complaints made by the Petitioner, as well as the civil suit against the District Attorney General's office, had been resolved, and that the Petitioner had no pending matters before the court. The post-conviction court also noted that the Petitioner's direct appeal of his conviction was complete and had been affirmed on appeal.

The post-conviction court went on to state that it had "no personal interest" in the Petitioner's case, that the court had neither "actual bias" nor was there "any appearance of bias," and that there was nothing in the record to indicate otherwise. The post-conviction court stated that "anybody [] who comes in this courtroom [knows] that they're getting a fair and impartial decision[.]" The post-conviction court denied the Petitioner's motion to recuse.

The post-conviction court subsequently held a hearing on the petition for post-conviction relief, wherein the following evidence was presented: Counsel testified that he was retained to represent the Petitioner at his trial for aggravated assault. He said that he had previously worked on "hundreds" of criminal trials. Counsel recalled that the facts surrounding the case involved a "road rage incident" when the Petitioner followed the victim to a gas station after getting off the highway and pushed the victim down on the ground causing injury. Counsel stated that, according to the medical records, the victim suffered three broken ribs, a dislocated shoulder, and other soreness.

Counsel testified that he spent "a whole, whole bunch of time" preparing for trial. He said he "interviewed multiple witnesses; [h]e went to the scene multiple times." Counsel recalled visiting the Petitioner in jail multiple times, reviewing videotape, filing motions to exclude evidence, and emailing the Petitioner's girlfriend in preparation for trial. Counsel agreed that he was the "lead attorney" on the day of trial but stated that two other attorneys assisted him during preparation. Counsel stated that the three attorneys interviewed all of the State's listed witnesses. He recalled that he obtained a background check on the victim to determine his prior criminal history but stated that the victim declined to be interviewed.

Counsel testified that he obtained the victim's medical records once it became clear that serious bodily injury was part of the indicted offense. The medical records were obtained several months before the Petitioner's trial, and Counsel stated that he and four

other attorneys reviewed the records. Counsel recalled that he received notice from the State one day before trial that the State would seek to introduce the victim's medical records. Regarding introduction of the medical records, Counsel stated that, "we had reviewed them and we knew what all was in them, so obviously we wanted to keep them out. When you look at [the records] as a whole, the medical records definitely hurt [the Petitioner], hurt more than it helped." When asked why the medical records would "hurt" the Petitioner's case, Counsel stated that it was the victim's rating of his pain level as a ten in the emergency room, the injuries to his ribs and shoulder, and the pain medication he was prescribed that would "hurt [the Petitioner's] case tremendously." Counsel agreed that the entire medical record was excluded and that the State's only proof of serious bodily injury was the victim's testimony.

Counsel testified that, because the medical records were excluded, the victim could not testify about his injuries specifically and that the victim could only testify about his level of pain, which, at trial, he stated was "extreme." Counsel stated that he "considered" using the medical records to impeach the victim's testimony but that he decided not to introduce them to prevent the State from bolstering the victim's testimony with the medical proof contained in the records.

Counsel recalled reviewing the medical records and finding a statement from the victim that his pain level was a "10 out of 10." He did not recall a statement by the victim that his pain level was a "3 out of 10." Counsel stated that the records on the whole, particularly the ones from the first few days after the incident, were "very bad" for the Petitioner's case.

Counsel agreed that the Petitioner asked him to file a motion requesting that the trial judge recuse himself, but he stated that it was the Petitioner's ultimate decision that the motion not be filed.

On cross-examination, Counsel agreed that it was his "trial strategy" to exclude the "scientific" evidence related to the victim's injuries, leaving the State with only the victim's testimony as proof of his injuries and pain level. Counsel recalled that the victim testified at trial that his pain was a "killing pain" and "the maximum[.]" He agreed that the victim testified that he had a "nerve block[.]" Counsel also agreed that, at trial, he challenged the constitutionality of the statutory definition of "serious bodily injury" on the grounds that it was vague. Counsel stated that, had he questioned the victim about any portion of the medical records, the entire record would have been admitted into evidence, which was contrary to his trial strategy of preventing the jury from hearing the medical proof of the victim's broken ribs, dislocated shoulder, and pain medication. Counsel stated that the Petitioner "was in agreement" with his trial strategy of excluding the medical proof.

7

The Petitioner testified that he did not know whether Counsel actually filed a motion to recuse at his request. The Petitioner stated that the grounds for the motion was a conflict of interest because of the Petitioner's complaints against the trial judge. The Petitioner stated that he had no knowledge of Counsel's interviewing witnesses. He stated that he felt that there was information beneficial to his case contained in the medical records and that he never met with Counsel to review the records. The Petitioner testified that the medical records indicated that the victim had shortness of breath, consistent with his lung disease and not his injuries. The Petitioner stated that he felt he had a strong case of self-defense and that Counsel failed to pursue it.

On cross-examination, the Petitioner agreed that he shoved the victim. He agreed that he previously told investigators that the victim tripped and fell, but he stated that, when he gave that statement, he did not remember what had happened. The Petitioner reiterated that Counsel never showed him the victim's medical records and that it was Counsel's decision to exclude the records at trial. The Petitioner agreed that he confronted the victim at the gas station, and there were four or five people watching. He stated that he shoved the victim because the victim slapped him, but he stated that he did not tell investigators about the slap because he did not remember it at the time.

Mark Donahoe testified that he was an attorney practicing in criminal defense and that he worked on the Petitioner's case. He was qualified as an expert in the field of criminal law. He stated that several lawyers were involved in the preparation of the Petitioner's case and that several trial strategies were considered. Mr. Donahoe stated that the Petitioner was in agreement with the trial strategy that was selected. He stated that the strategy was to exclude everything that was not going to be helpful to the Petitioner's case, particularly the medical records, because the records supported the State's theory that the Defendant inflicted serious bodily injury. For the same reason, the attorneys sought to exclude the video recording of the incident. They were successful in excluding both pieces of evidence, thereby limiting the victim's testimony about his injuries.

Mr. Donahoe stated that there were "numerous" consultations with the Petitioner. He recalled that the Petitioner was potentially facing a ten-year sentence or longer and that the attorneys encouraged him to plead guilty when the State offered him a plea deal for a six-year sentence. Mr. Donahoe recalled that the Petitioner originally agreed to plead guilty but later refused the State's offer unless he would be released from jail on bond. Mr. Donahoe testified that, based on his experience, the trial strategy implemented was "the best defense possible in this case."

After considering the evidence, the post-conviction court denied the Petitioner's petition for post-conviction relief. In its order, the post-conviction court made the following

statements relevant to the issue on appeal:

> The eighteenth issue stating that trial counsel was ineffective when filing a pretrial motion to limit or suppress the victim's medical records clearly relates to strategy. [Post-conviction counsel] for the [P]etitioner made the argument that [Counsel] should have reconsidered this strategy when the victim testified. This clearly demonstrates that the suppression or limitation of the medical records was a matter of trial strategy. Mark Donahoe qualified before this Court in the area of criminal law having twenty-nine years experience testified that the suppression or limitation of the medical records was a common tactic or strategy employed in criminal cases. The Court cannot judge this strategy based upon hindsight. This is a strategy [decision] to be made prior to trial without the guarantee of the outcome and does not constitute ineffective assistance of counsel.

The post-conviction court further concluded:

> The Court finds that as to each of the issues raised in the petition and amended petition that the [P]etitioner has failed to prove by clear and convincing evidence that [C]ounsel was in any manner ineffective or that [the Petitioner] was in any manner denied any right or privilege guaranteed under the constitution of the State of Tennessee o[r] the Constitution of the United States. In this particular case the [P]etitioner had the benefit of an entire firm not only the services of [Counsel]. Counsel obtained pretrial discovery, filed all relevant motions and interviewed or attempted to interview all witnesses known to the defense and the State. Counsel was successful on all pre trial motions. Counsel discussed all evidence, motions and strategy at length with the [P]etitioner. [Counsel] obtained a favorable plea deal which was rejected by the [Petitioner]. The defense was based upon sound and accepted trial strategy without the guarantee of outcomes which cannot be done in criminal matters. The Court cannot judge the performance based upon the outcome and hindsight.

It is from this judgment that the Petitioner now appeals.


## II. Analysis

### A. Ineffective Assistance of Counsel

9

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition because he received the ineffective assistance of counsel at trial when Counsel failed to use the victim's medical records to impeach the victim's testimony about his level of physical pain. The State responds that the proof presented at the post-conviction hearing made it clear that Counsel's representation of the Petitioner was well within the range of competence demanded of attorneys, and furthermore, the Petitioner has not established that Counsel's decision not to introduce the records changed the outcome of the case. On that basis, the State argues that the trial court properly denied the petition. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against it. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419

(Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In the matter at hand, the post-conviction court examined Counsel's decision to exclude the victim's medical records, as testified to by Counsel, Mr. Donahoe, and the

11

Petitioner. Counsel testified that he and a team of attorneys had specifically examined the victim's medical records as a whole and made the decision that the records were harmful to the Petitioner's case and, thus, should be excluded from the evidence. He testified that the attorneys considered introducing only beneficial portions of the record but that when it became clear that the entire record would have to be admitted, they decided that the negative aspects of introducing the records outweighed the benefits of introduction of the records. The post-conviction court concluded that the decision was a matter of strategy to limit the jury's exposure to the victim's injuries, because, without the medical records being admitted into evidence, the victim was prevented from testifying about any medical proof of his injuries. This, the post-conviction court noted, was an accepted practice by criminal defense attorneys and did not constitute ineffective assistance of counsel simply because the strategy had not worked.

We conclude that the post-conviction court's decision was supported by the evidence presented at the hearing. The record shows that Counsel made an informed and deliberate decision to exclude the medical records to limit the jury's exposure to the medical diagnosis about the extent of the victim's injuries. Counsel testified that the medical records contained information that was harmful to the Petitioner's case and, therefore, needed to be excluded. Counsel stated that the records would only bolster the victim's testimony, in his opinion, further damaging the Petitioner's case by showing the jury the extent of the victim's injuries. He testified about the details contained in the medical records concerning the victim's injuries and hospital treatment. In furtherance of Counsel's stated trial strategy to limit the jury's exposure to the nature of the victim's injuries, Counsel also successfully excluded a video recording of the altercation, leaving the State with only the victim's testimony as evidence of the assault and injuries.

Based upon this evidence, we agree that Counsel was not ineffective when he made the decision to exclude the medical records. His decision was an informed, tactical one in consideration of the negative information contained in the record as well as the Petitioner's chances at trial without the jury's exposure to that negative information. As this Court has previously noted, "[a]llegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief." *Taylor v. State*, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991). Counsel has discretion in conducting the defense and is entitled to use his best judgment in matters of trial strategy or tactics. *See McBee v. State*, 655 S.W.2d 191, 193 (Tenn. Crim. App. 1983). Thus, we conclude that the Petitioner failed to show that Counsel's services fell outside the range of competence normally required of attorneys in criminal trials. *See Baxter*, 523 S.W.2d at 936. Having failed to show the first prong of the *Strickland* standard, the Petitioner has not met his burden of showing that he is entitled to post-conviction relief based upon Counsel's performance. *Id.* He is not entitled to relief on this issue.

## B. Recusal

The Petitioner also argues that the post-conviction court erred when it denied his motion for recusal. The Petitioner contends that his motion should have been granted because he had filed multiple complaints against the post-conviction judge and the "repeated nature" of those complaints, coupled with the "comparatively serious allegations" in the complaints, would cause an "impartial person to question whether the [post-conviction] court could act with absolute objectivity and detachment. . . ." The State responds that the post-conviction court did not abuse its discretion when it denied the Petitioner's motion to recuse and that, based on the post-conviction court's statements regarding its ruling, it was clear that the court would act impartially. The State also responds that the Petitioner failed to show any compromise of impartiality by the post-conviction court and, therefore, the post-conviction court properly exercised its discretion.

"The right to a fair trial before an impartial tribunal is a fundamental constitutional right." *State v. Austin*, 87 S.W.3d 447 at 470 (Tenn. 2002). "[T]he preservation of the public's confidence in judicial neutrality requires not only that the judge be impartial in fact, but also that the judge be perceived to be impartial." *Kinard v. Kinard*, 986 S.W.2d 220, 228 (Tenn. Ct. App. 1998). Recusal is warranted "when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994). "Hence, the test is ultimately an objective one since the appearance of bias is as injurious to the integrity of the judicial system as actual bias." *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 565 (Tenn. 2001). Tennessee Supreme Court Rule 10(B)(2.06), amended in 2012, states that this Court shall review a trial court's decision on a motion to recuse "on an expedited basis based upon a *de novo* standard of review. Tenn. Sup.Ct. R. 10(B)(2.06) (2012).

In this case, the post-conviction court heard post-conviction counsel's request for recusal and denied the motion. The post-conviction court stated that the basis for the Petitioner's motion was complaints that the Petitioner had filed in the past against the judge. The post-conviction court noted that those complaints had been resolved and that the Petitioner had no complaints pending against the judge. Further, all of the Petitioner's prior criminal matters that had been heard by the judge had been resolved on appeal. Thus, the post-conviction court concluded that there was no appearance of bias. The post-conviction court went on to state that it had no actual bias against the Petitioner and understood that a judge might not always be a favorable figure with litigants but nonetheless was required to do his job impartially and objectively.

13

Having carefully reviewed the record, it does not appear that there was a reasonable basis to question the court's impartiality; therefore, the Petitioner is not entitled relief.

## III. Conclusion

After a thorough review of the record and the applicable law, we conclude the post-conviction court properly denied the Petitioner's petition for post-conviction relief. The evidence does not preponderate against the post-conviction court's findings that Counsel made an informed decision to exclude the medical record. We further conclude that the post-conviction court did not err when it denied the Petitioner's motion to recuse. In accordance with the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE